**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

Mickyas Berhanemeskel,

    Plaintiff

v.

Sergio Lopez, et al.,

    Defendants

Case No.: 2:24-cv-01371-JAD-DJA

**Order Denying Plaintiff's Motion for Summary Judgment, Granting Defendant's Motion for Summary Judgment, and Denying as Moot Plaintiff's Motions for Status Check**

[ECF Nos. 70, 151, 179, 180, 181]

Las Vegas Metropolitan Police Officers Sergio Lopez, Trevor Rundus, and Kade Lorson arrested pro se plaintiff Mickyas Berhanemeskel after his ex-girlfriend reported that he broke into her apartment using a pocketknife. Berhanemeskel now sues those officers under 42 U.S.C. § 1983, alleging that they violated his First, Fourth, and Fourteenth Amendment rights against excessive force, deliberate indifference to serious medical needs, and retaliation. Both parties move for summary judgment. Because the officers are entitled to qualified immunity on all claims, I grant the officers' motion, deny Berhanemeskel's, and close this case.

**Background**

The parties dispute what happened on February 25, 2024, when the officers arrested Mickyas Berhanemeskel outside Beza Buruk's apartment. Berhanemeskel says he returned to Buruk's apartment that evening after spending part of the day there and entered through a back-bedroom window that Buruk routinely left unlocked for him.[1]

---

[1] ECF No. 151-2 at 11–12 (Berhanemeskel's deposition).

The officers' account begins with a different premise that Buruk called 911 and reported that her ex-boyfriend had broken into her apartment using a knife.[2]  Officer Lorson, who had interacted with Buruk earlier that day about a similar issue with Berhanemeskel, arrived first.[3]  Buruk informed the officers that she was the only person on the lease and that Berhanemeskel knew that he was not supposed to be there.[4]  She recounted that after she refused to let Bernhanemeskel in, he tried and succeeded in entering the apartment using a pocketknife.[5]  She stated that she'd fled the apartment because she feared for her safety, and she provided paperwork for a temporary protection order against Berhanemeskel that had not yet been served.[6]

Just how Berhanemeskel found himself inside Buruk's apartment matters not.  It's what happened next that is the subject of this lawsuit.  And Berhanemeskel alleges that those next events constitute excessive force, deliberate indifference to serious medical needs, and retaliation, violating his constitutional rights.

**A.    Berhanemeskel claims that the arrest caused him injury and that the officers delayed medical care to cover it up.**

Berhanemeskel's account of the arrest begins with him "outside his address," facing armed officers and following commands.[7]  He says that the officers ordered him to the ground,

---

[2] ECF No.151-1 at 2 (declaration of arrest report).

[3] *Id.*

[4] *Id.*; Officer Lorson's bodycam footage T02:30:50Z.  The defendants submitted all the officers' body-cam footage to the court, but Lorson's is the only bodycam footage with audio.  *See, e.g.,* ECF No. 153, 173.

[5] *Id.*

[6] *Id.*

[7] ECF No. 87 at 3 (second amended complaint).

2

directed him to place his hands over his head, and told him to lift and cross his feet.[8]  Because he contends that he complied with all those commands, he describes the next moments as an unnecessary escalation.[9]  Officers "jumped" onto his feet and drove his crossed legs toward his back until his feet "slammed" into his lower back, causing "excruciating and agonizing" pain that shot from his lower back up to his neck.[10]  And once his hands were cuffed behind his back, an officer used "extreme force" by yanking his arm hard enough to injure his shoulder.[11]  He also attributes lingering back problems to that night and, in his summary-judgment motion, Berhanemeskel adds that he now permanently wears a back brace, takes daily pain medication, and has been medically excused from a firefighting program.[12]

Berhanemeskel also frames the minutes that followed his arrest as deliberate indifference to his medical needs.  He says that he struggled to breathe and asked to be taken to the hospital, but the officers resisted allowing EMTs to transport him.[13]  Firefighters intervened by warning that refusing transport would be unlawful and that the officers would bear responsibility if he died in custody while visibly having trouble breathing.[14]  Only then, he says, did the officers allow EMTs to take him to the University Medical Center (UMC) hospital to be evaluated.[15]

Berhanemeskel's retaliation theory also springs from that medical-care dispute.  He alleges that the officers anticipated that hospital treatment would document his injuries and

---

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] ECF No. 70 at 4.

[13] ECF No. 87 at 4.

[14] *Id.*

[15] *Id.*

"follow with a lawsuit." So they denied or delayed care to conceal what Berhanemeskel characterizes as unconstitutional force.[16]

### B. Body-worn cameras documented the arrest, search, and the start of medical transport.

The encounter was recorded on all three officers' body-worn cameras, though only Lorson's footage includes audio. It plainly shows that the officers spy Berhanemeskel coming down from Buruk's apartment.[17] The officers draw lethal and non-lethal weapons and order Berhanmeskel to show his hands and turn away.[18] Berhanemeskel gets on the ground, so an officer tells him to put his arms out with his heels to his butt.[19] Officer Lopez then positions himself on top of Bernhanemeskel's legs, while he and Officer Rundus work to control Berhanemeskel's hands and affix handcuffs.[20] Both officers release their hold once the handcuffs are secured, and Officer Lopez is seen turning Bernhanemeskel while he is on the ground to search him.[21] An officer asks whether he has a knife; Berhanemeskel replies that he did not.[22]

The footage then shows the officers escorting Berhanemeskel to a patrol car.[23] Officer Lorson's footage shows him running a records check inside the patrol car[24] while the other

---

[16] *Id.* at 5.

[17] Officer Lorson's bodycam footage, T02:35:32Z; ECF No. 151-1 at 2.

[18] Officer Lorson's bodycam footage, T02:35:50Z–T02:36:13Z.

[19] *Id.*

[20] Officer Rundus's bodycam footage, T02:36:29Z– T02:36:50Z.

[21] Officer Lopez's bodycam footage, T02:36:53Z–T02:36:09Z.

[22] Officer Lorson's bodycam footage, T02:36:50Z. Later, officers found two knives inside Buruk's apartment that she claimed were not hers. ECF No. 151-1 at 2.

[23] Officer Lorson's bodycam footage, T02:37:14Z–T02:38:08Z.

[24] Officer Lorson's footage ends inside the patrol car.

4

officers remain outside with Berhanemeskel. Because the other cameras lack audio, the record does not reveal precisely when Berhanemeskel informed the officers of his breathing problems or when the Clark County Fire Department and medical were dispatched for it,[25] but these services arrive less than 20 minutes later.[26] Berhanemeskel is placed on a stretcher, and Officer Lopez's footage shows him briefly pausing the transport before Berhanemeskel is loaded into the ambulance.[27]

**C.    Both parties move for summary judgment.**

Berhanemeskel does not attach any evidence to his motion but does to his opposition to the officers' motion. In both the officers' opposition to Berhanemeskel's motion and their own summary-judgment motion, the officers argue that the body-worn-camera footage squarely contradicts Berhanemeskel's account and that they are entitled to qualified immunity.[28] Berhanemeskel maintains that genuine disputes of material fact prevent the court from granting summary judgment on the immunity issue and instead must be resolved at trial. He has also filed three requests for status updates, asking about the case's progress and the status of the trial date.[29]

---

[25] ECF No. 166 at 77.

[26] Officer Rundus's bodycam footage, T02:54:44Z.

[27] Officer Lopez's bodycam footage, T03:01:48Z–03:02:30Z.

[28] ECF No. 151 at 9.

[29] ECF No. 179 at 1; ECF No. 180 at 1; ECF No. 181 at 1.

5

**Discussion**

**A.     Standards for cross motions for summary judgment**

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[30]  The moving party bears the initial responsibility of presenting the basis for its motion and identifying the portions of the record or affidavits that demonstrate the absence of a genuine issue of material fact.[31]  If the moving party satisfies its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show a genuine issue for trial.[32]

Who bears the burden of proof on the factual issue in question is critical.  When the party moving for summary judgment would bear the burden of proof at trial (typically the plaintiff), "it must come forward with evidence [that] would entitle it to a directed verdict if the evidence went uncontroverted at trial."[33]  Once the moving party establishes the absence of a genuine issue of fact on each issue material to its case, "the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense."[34]

When instead the opposing party would have the burden of proof on a dispositive issue at trial, the moving party (typically the defendant) doesn't have to produce evidence to negate the opponent's claim; it merely has to point out the evidence that shows an absence of a genuine

---

[30] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[31] *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

[32] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes,* 67 F.3d 816, 819 (9th Cir. 1995).

[33] *C.A.R. Transp. Brokerage Co. v. Darden Rests, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) (citation and quotations omitted)).

[34] *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (citation omitted).

material factual issue.[35]  The movant need only defeat one element of the claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[36]  "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them."[37]

**B.    The doctrine of qualified immunity shields the officers from all of Bernhanemeskel's claims.**

The doctrine of qualified immunity protects government officials "from money damages unless a plaintiff pleads facts showing that (1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct."[38]  When a defendant raises this affirmative defense, the plaintiff bears the burden of demonstrating that both prongs are met.  Although the evidence must be considered in the light most favorable to the plaintiff,[39]  the plaintiff's version of events should not be adopted if there is video evidence that "tells quite a different story."[40]  The plaintiff's failure to establish either prong compels summary judgment in favor of the defendant on qualified-immunity grounds.  Courts "have

---

[35] *See, e.g., Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990); *Celotex*, 477 U.S. at 323–24.

[36] *Celotex*, 477 U.S. at 322.

[37] *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two,* 249 F.3d 1132, 1134 (9th Cir. 2001)).

[38] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[39] *Isayeva v. Sacramento Sheriff's Dep't.*, 872 F.3d 938, 946 (9th Cir. 2017); *Tolan v. Cotton,* 572 U.S. 650, 657 (2014).

[40] *See Scott v. Harris*, 550 U.S. 372, 379–81 (2007).

discretion to choose which qualified-immunity prong to address first" and, depending on the conclusion reached for the first-analyzed prong, "need not address the other."[41]

For a right to be clearly established, it must be "sufficiently clear that every reasonable official would understand that what he is doing violates that right."[42] The "rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority."[43] And the right may not be characterized "at a high level of generality."[44] Instead, "[t]he dispositive question is whether the violative nature of particular conduct is clearly established."[45] The takeaway from the Supreme Court's recent qualified-immunity jurisprudence is that a court's analysis of the clearly-established-law prong "must be undertaken in light of the specific context of the case, not as a broad general proposition"[46]

### 1. *Berhanemeskel has not shown the violation of a clearly established Fourth Amendment right.*

Berhanemeskel advances three excessive-force theories under the Fourth Amendment. He contends that the officers used excessive force by (1) drawing their weapons while he had his hands up and was facing away;[47] (2) applying bodyweight pressure to his back and legs while he was complying, driving his crossed legs toward his back until his feet "slammed" into his lower

---

[41] *Isayeva*, 872 F.3d at 946 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

[42] *Smith v. Agdeppa*, 81 F.4th 994, 1001 (9th Cir. 2023) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015)).

[43] *Id.*

[44] *Mullenix*, 577 U.S. at 12 (quoting *al-Kidd*, 563 U.S. at 742).

[45] *Id.*

[46] *Id.*

[47] ECF No. 70 at 6.

back;[48] and (3) "yanking" his arm with "extreme force" after he was handcuffed, injuring his shoulder.[49] He argues that qualified immunity "has to be lifted" because he complied with directions yet "sustained serious injuries."[50]

### a. *Berhanemeskel's weapon-drawing theory is unsupported by the record.*

Berhanemeskel's first excessive-force theory is based on the officers' decision to draw their weapons while, in his telling, he stood facing away with his hands up.[51] But the bodycam footage contradicts the factual premise as he frames it. Officer Lorson's video shows that the officers drew their weapons while Berhanemeskel was still approaching them.[52] And it is clear from that footage that he turned away only after an officer ordered him to do so.[53] So the evidence plainly shows no facts to support this theory.

### b. *There is no clearly established law prohibiting the use of bodyweight on a prone suspect's legs until handcuffs are secured under these circumstances.*

Berhanemeskel's second theory is that the officers "jumped on his feet" and applied full body weight, forcing his legs up until his feet slammed into his lower back.[54] In his deposition, Berhanemeskel describes it this way: "all three officers rushed me on my back. I felt the weight of three officers, and I hurt my back."[55] The defendants dispute this description of events and argue that the footage belies it.

---

[48] ECF No. 87 at 3.

[49] *Id.*

[50] ECF No. 166 at 11.

[51] ECF No. 70 at 6.

[52] Officer Lorson's bodycam footage, T02:35:52Z.

[53] *Id.* at T02:35:59Z.

[54] ECF No. 87 at 3.

[55] ECF No. 151-2 at 13.

The video does not show Officer Lopez "jumping" on Berhanemeskel's legs, nor does it show him placing weight on Berhanemeskel's upper back.[56] At most, it shows pressure being applied to Berhanemeskel's legs—Lopez's body appears to be on top of Berhanemeskel's legs, and the heels of Berhanemeskel's feet reach up to his butt at most.[57] But the video makes it difficult to quantify how much force was applied. Because I cannot reliably measure the force from the footage alone, I resolve that factual ambiguity in Berhanemeskel's favor for purposes of qualified immunity and assume that the level of force was significant enough to cause the injuries he claims.[58]

But even with that assumption, Berhanemeskel's response does little to meet his burden on the clearly established prong of the qualified-immunity inquiry. He asserts that he was compliant, but he does not explain why a reasonable officer would have understood that this brief leg-pressure restraint during handcuffing was unlawful under these circumstances. The Ninth Circuit's clearly established excessive-force cases in the prone-restraint context involve substantially more serious circumstances like prolonged pressure on the neck, torso, or back that restricts breathing or blood flow after the individual is restrained and no longer resisting. In *Drummond ex rel. Drummond v. City of Anaheim*, for example, officers restrained a mentally ill man who was not wanted for any crime.[59] Once prone and handcuffed, he did not resist, yet two

---

[56] Officer Lopez's bodycam footage, T02:36:27Z.

[57] Officer Rundus's bodycam footage, T02:36:37Z.

[58] Berhanemeskel also reported to the responding paramedics that after the officers tackled and handcuffed him, he was experiencing chest and back pain and difficulty breathing. ECF No. 166 at 70. He told them that he had a preexisting back injury from a December 2023 car accident. *Id.* He also reported intermittent shortness of breath for the preceding few weeks and attributed stress and anxiety to personal problems with his girlfriend. *Id.* He admitted that he had been drinking that night and denied any other complaints at that time. *Id.* But he did not tell the officers about that medical history during the alleged use of force or immediately afterward.

[59] *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003).

10

officers pressed their weight onto his neck and torso, "crushing him against the ground," and they did not remove that pressure despite his pleas for air.[60]  The Ninth Circuit concluded that this conduct was "clearly constitutionally excessive" and that the officers were not entitled to qualified immunity because any reasonable officer should have known that pressing weight on a compliant, handcuffed person's neck and torso despite cries for air is excessive force.[61]

The Ninth Circuit's decision in *Gregory v. County of Maui* illustrates *Drummond*'s limits. The panel upheld the officers' use of a prone restraint to disarm and handcuff a resisting suspect even though the restraint included pressure to the back and neck, and he stated that he could not breathe.[62]  It distinguished *Drummond* because the suspect was holding a pen as a weapon, acted aggressively, assaulted someone earlier, and trespassed.[63]  The court also found it significant that unlike in *Drummond*, the officers in *Gregory* "ceased using force once Gregory was handcuffed."[64]  On those facts, the panel held that the officers "reasonably used the minimal force necessary to disarm and to restrain Gregory."[65]

The Ninth Circuit has applied *Drummond* to find it clearly established that officers may not maintain dangerous, compressive force on a restrained person for a "significant period" after resistance has ceased, but it has also declined to extend *Drummond* to brief, seconds-long restraint that is materially less severe.  In *Zelaya v. Las Vegas Metropolitan Police Department*,

---

[60] *Id.*

[61] *Id.* at 1061–62.

[62] *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1105 (9th Cir. 2008).  When the officers sat him up after handcuffing him, they discovered that he was not breathing.  *Id.*  An autopsy attributed his death to a heart attack due to severe heart disease and marijuana intoxication.  *Id.*

[63] *Id.* at 1108–1109.

[64] *Id.*; *Arce v. Blackwell*, 294 F. App'x 259, 261–62 (9th Cir. 2008).

[65] *Gregory*, 523 F.3d at 1109.

after officers got the detainee to the ground and handcuffed him, a video showed him motionless and unresisting for more than 90 seconds while officers continued to pin him with their body weight and bend his legs toward his torso.[66]  The Ninth Circuit applied *Drummond* but found that whether 90 seconds constituted a significant period of time, such that *Drummond* supplied the clearly established rule, precluded summary judgment.[67]  The Ninth Circuit panel in *A.B. v. County of San Diego*, by contrast, held that even assuming deputies used more force than necessary for 30 seconds after the detainee stopped moving, no clearly established law put them on notice that this brief continuation was excessive.[68]  The *A.B.* panel distinguished its facts from *Drummond* because the *Drummond* force involved materially more dangerous compression (kneeling on the neck).[69]

The unlawful conduct that *Drummond* and its progeny clearly establish crosses a line that the officers' conduct here falls short of.  The officers responded to Buruk's report that Berhanemeskel had broken in with a knife.  So even though no officer saw a knife in Berhanemeskel's hands, they had reason to treat the encounter as a potential home-invasion arrest involving a weapon.  And unlike the plaintiffs in the *Drummond* line of cases, Berhanemeskel did not appear to struggle for air or report pain during the restraint; he continued speaking with the officers while they secured him.  The footage also does not show compressive pressure on his neck, back, or torso.  It shows Officer Lopez positioned over Berhanemeskel's legs while Officers Lopez and Rundus secured his hands—a hold that ended roughly 30 seconds later once the handcuffs were on.  These facts align this case more with *A.B.* than *Drummond*.

---

[66] *Zelaya v. L.V. Metro. Police Dep't*, 682 F. App'x 565, 567 (9th Cir. 2017).

[67] *Id.*

[68] *A.B. v. Cnty. of San Diego*, 2022 WL 1055558, at *1–2 (9th Cir. Apr. 8, 2022).

[69] *Id.*

So even accepting Berhanemeskel's account that he was compliant and the leg pressure caused his claimed injury, existing precedent did not place the unlawfulness of this brief leg-restraint maneuver beyond debate, and the defendants enjoy qualified immunity from liability for this theory.[70]

       c.       ***There is no clearly established law that would have put a reasonable officer on notice that the described post-handcuff "repositioning" during a search was unlawful.***

Berhanemeskel's third theory is that, after his hands were cuffed, an officer "yanked" his arm with "extreme force," injuring his shoulder.[71]  He does not pin down in his pleadings when this occurred.  But in his deposition, Berhanemeskel described an officer "grabbing" him and "yanking [his] shoulder left and right" while "manhandling" him.[72]  Read alongside the bodycam footage, that account appears to describe the officers' efforts to search and reposition Berhanemeskel on the ground.

The footage shows Berhanemeskel laying on his right side with his knees turned to the right as an officer searches his left pockets using his left hand.[73]  To reposition him, the officer threads his left hand beneath Berhanemeskel's left arm and places his right hand behind and

---

[70] Berhanemeskel cites Metro's internal use-of-force policies to argue that qualified immunity doesn't apply.  ECF No. 166 at 11.  He did not attach those policies to his opposition, but he asserts that Metro requires officers to use a low level of force that does not cause injury and that Officer Lopez employed a disapproved prone-restraint tactic.  *Id.*  Berhanemeskel does not argue how those policies, on their own, can satisfy the clearly-established prong.  *See D.C. v. Wesby*, 583 U.S. 48, 64 (2018) ("[W]e have stressed the need to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.") (cleaned up); *Perez v. City of Fresno*, 98 F.4th 919, 928 (9th Cir. 2024) (holding that Supreme Court precedent "does not establish that any violation of police policy or guidance is, in and of itself, sufficient to deny qualified immunity").

[71] ECF No. 87 at 3.

[72] ECF No. 151-2 at 14.

[73] Officer Lorson's bodycam footage, T02:36:51Z–T02:36:07Z.

13

around the right side of Berhanemeskel's neck to roll him onto his left side. The officer then wraps his arms around Berhanemeskel's right arm and pulls him back toward center. During these movements, Berhanemeskel keeps talking to Officer Kade about how he got into the apartment.

I cannot determine from the video alone how much force was applied during these movements. So I accept Berhanemeskel's account that that the maneuver caused him shoulder pain and that he later received Motrin and lidocaine prescriptions for it.[74] But Berhanemeskel doesn't adequately dispute the officers' argument that this maneuver was not clearly established as unlawful. Beyond asserting that he was compliant, Berhanemeskel offers no argument or case law establishing that a reasonable officer would have understood that repositioning a handcuffed detainee on the ground during a search after officers had been told that he had a knife was unlawful. And I could not find any case law that would have put an officer on notice that this conduct was unlawful. So the officers are entitled to qualified immunity on this theory, too.

### 2. *Berhanemeskel has not shown that the officers violated a Fourteenth Amendment right.*

Berhanemeskel's Fourteenth Amendment claim focuses on what happened after he was handcuffed. He alleges that he experienced difficulty breathing and that the officers were deliberately indifferent to that medical need in two ways: (1) they refused to summon medical care at all despite his requests,[75] and (2) even once fire and medical personnel were on scene, the officers resisted or delayed hospital transport.[76]

---

[74] ECF No. 166 at 70 (UMC's rapid medical assessment).

[75] ECF No. 70 at 7.

[76] *Id.* at 7; ECF No. 87 at 4.

A pretrial detainee's right to adequate medical care is protected by the Fourteenth Amendment.[77]  Officers violate that right when they are deliberately indifferent to a detainee's medical needs.[78]  To establish deliberate indifference, a pretrial detainee must show that "(1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) by not taking such measures, the defendant caused the plaintiff's injuries."[79]

The officers contend that Berhanemeskel cannot show a genuine issue of material fact on this deliberate-indifference claim because the body-worn-camera footage and medical records undermine his assertion that they refused him medical care.[80]  They acknowledge that he reported chest pain and breathing difficulty, but they argue that the record does not support his assertion that they refused medical care or impeded hospital transport.[81]  In their view, the bodycam footage shows that Officer Rundus asked whether Berhanemeskel needed medical attention, Berhanemeskel declined, and Rundus nevertheless summoned medical responders.[82]  While they acknowledge a 45-second exchange before transport during which Officer Lopez

---

[77] *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018).

[78] *Id.*

[79] *Id.* at 1125.

[80] ECF No. 151 at 9.

[81] *Id.*

[82] *Id.* at 10.  Because this footage is muted, I cannot confirm this.

paused medical providers, they contend that it does not amount to deliberate indifference because he was ultimately transported to the hospital.[83]

Berhanemeskel's argument is essentially that any delay in treatment is a constitutional violation. He contends that he repeatedly requested hospital transport, that the officers delayed or interfered with it and that transport occurred only after firefighters and medical intervened.[84] He adds that the officers acted with deliberate indifference by allowing transport only after firefighters intervened, ending a "two-to-three-minute" standoff.[85] Berhanemeskel attaches a paramedic document to support his theory.[86] It reflects that, while he was being moved to the ambulance, an officer paused the transport, asked why he wanted to go to the hospital, and advised him that he would still be taken to jail after medical clearance.[87] It further recounts that firefighters advised the officers that "they could not delay transport with those kinds of questions and[,] given the patient's complaint[,] he needed to go to the hospital without delay."[88] The transport then proceeded. The bodycam footage fixes the duration of that interruption at less than a minute.[89]

But that doesn't fill all of the gaps in this deliberate-indifference claim that the defendants pointed out in their motion for summary judgment. Berhanemeskel offers no proof

---

[83] ECF No. 173 at 6.

[84] ECF No. 166 at 13. Berhanemeskel also disputes the officers' version of the exchange with Officer Rundus, insisting that it's false that he declined medical attention.

[85] ECF No. 166 at 13.

[86] *Id.* at 77.

[87] *Id.*

[88] *Id.*

[89] Officer Rundus's bodycam footage, T02:54:43Z. Bernhanemeskel was strapped to a stretcher by T02:58:56Z. At T03:01:45Z, an officer briefly stops the transport, and the interaction ends by T03:02:25Z.

16

that this sub-minute pause placed him at a substantial risk of serious harm—indeed, responders were actively transporting Berhanemeskel when this pause occurred.  The interruption happened in the middle of that process, with medical personnel present and communicating.  And there is no evidence that Berhanemeskel's condition deteriorated during that brief interval or that urgent treatment was withheld.  Nothing in this record suggests that the brief pause placed Berhanemeskel at an obvious, substantial risk of serious harm.

And Berhanemeskel does not argue or support with evidence that the interruption caused him additional harm—as needed to satisfy the fourth element.  The paramedic report reflects that before transport, responders assessed Berhanemeskel's breath sounds and found them "present, clear[,] and equal" with "[n]o obvious abnormalities."[90]  After he was moved into the ambulance, they reassessed him for any change and documented none.[91]  Berhanemeskel submits other medical records, but he does not identify any notation tying his symptoms, diagnosis, or treatment to the short pause in transport.  He does not claim that his condition worsened during the interruption or that any delay aggravated his breathing complaint.  The only "harm" he identifies is that he experienced symptoms and later received medical treatment for the injuries he sustained during the arrest.

Berhanemeskel's alternative narrative that the officers refused to summon medical care until firefighters arrived fails for a similar reason.  His own exhibit reflects that Medic 141 was dispatched *along* with Clark County Fire Department "for a breathing problem."[92]  That record is inconsistent with the notion that medical attention occurred only after firefighters forced the

---

[90] ECF No. 166 at 77.

[91] *Id.*

[92] *Id.*

officers' hands; it reflects that the fire department and medical responders were dispatched together for the breathing complaint in the first instance, which was called in by the officers. Because Berhanemeskel has not raised a genuine issue that the officers' conduct exposed him to an obvious, substantial risk of serious harm or caused him injury, he cannot establish a Fourteenth Amendment violation. The officers are therefore entitled to qualified immunity from his deliberate-indifference claim.

### 3. *Berhanemeskel has not shown that the officers violated his First Amendment right.*

Berhanemeskel's First Amendment retaliation claim is intertwined with his Fourteenth Amendment medical-care theory. He claims that the denial of care was retaliatory, triggered by his statement that he was going to sue the officers for his injuries, and motivated by a desire to avoid a lawsuit and conceal misconduct.[93] The Ninth Circuit has made clear that retaliatory punishment is prohibited under the First Amendment, and that this prohibition is clearly established law for purposes of qualified immunity.[94] To prevail on a First Amendment retaliation claim, the plaintiff must show that (1) the state actor took an adverse action, (2) because of (3) the plaintiff's protected conduct, (4) the action chilled the plaintiff's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate penological purpose.[95]

The officers argue that Berhanemeskel cannot create a genuine dispute on the first two retaliation elements—an adverse action taken because of protected conduct.[96] Berhanemeskel

---

[93] ECF No. 70 at 8; ECF No. 87 at 5.

[94] *Rhodes v. Robinson*, 408 F.3d 559, 569 (9th Cir. 2005).

[95] *Id.*

[96] ECF No. 87 at 5.

alleges in his amended complaint that, after he said he would sue, the officers denied him medical care in order to retaliate "to mask or hide their misgivings."[97]  But the officers contend that the record forecloses that premise because medical was summoned, responders evaluated Berhanemeskel, and he was transported to the hospital for further evaluation.[98]  If the challenged adverse action never occurred, there is no genuine dispute of material fact, and they are entitled to summary judgment on the claim.

Even assuming Berhanemeskel made a statement about suing for his excessive-force injuries, he does not support that any adverse action occurred.  The record reflects that medical was summoned within 20 minutes after he was handcuffed,[99] responders arrived and evaluated him, and he was transported to the hospital for further evaluation.  Berhanemeskel offers no evidence contradicting that sequence or that the timeline reflects retaliatory conduct rather than ordinary logistics.  Because Berhanemeskel has not shown any evidence that the officers took an adverse action because of his protected conduct, the officers are entitled to summary judgment on his retaliation claim.

## Conclusion

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment **[ECF No. 151] is GRANTED** based on qualified immunity.  IT IS FURTHER ORDERED that Berhanemeskel's motion for summary judgment **[ECF No. 70] is DENIED.**  Berhanemeskel's

---

[97] He claims that body-camera footage from the officers and "Bravo Pablin De Jesus" supports his account.  ECF No. 166 at 15.  But De Jesus is not otherwise identified in any motion papers, and Bernhanemeskel did not attach the footage, explaining that the flash drives containing it are with the law library.  *Id.* at 146.

[98] ECF No. 151 at 11–12.

[99] Officer Rundus's bodycam footage, T02:54:44Z.

motions for status checks **[ECF Nos. 179, 180, 181] are DENIED as moot.  The Clerk of**

**Court is directed to ENTER JUDGMENT for the defendants and close this case.**

_____
U.S. District Judge Jennifer A. Dorsey
January 28, 2026

20